IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CORY L. DIETEMAN,<br><br>             Plaintiff,<br><br>   vs.<br><br>THE COUNTY OF LANCASTER, NEBRASKA, LANCASTER COUNTY ADULT DETENTION FACILITY, MICHAEL THURBER, DR. DOUGLAS MORIN, THE COUNTY OF DOUGLAS, NEBRASKA, DOUGLAS COUNTY ADULT DETENTION CENTER, MARK FOXALL, AND JOHN AND JANE DOES 1-10,<br><br>             Defendants. | 4:14CV3053<br><br>**MEMORANDUM AND ORDER** |

      This matter is before the court on the motions for summary judgment filed by the County of Lancaster, Nebraska and Michael Thurber (the "Lancaster Defendants"), Mark Foxall, and Dr. Douglas Morin, (See Filing No. 83; Filing No. 86; Filing No. 89), and the motion for summary judgment filed by Defendant Douglas County. (See Filing No. 91). For the reasons discussed below, Defendants' motions will be granted and Plaintiff's claims will be dismissed.

### STANDARD OF REVIEW

      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely

determines whether there is evidence creating a genuine issue for trial. [Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999)](#).

The moving party bears the burden of showing there are no genuine issues of material fact. [Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)](#). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)](#) (quoting [First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968))](#). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." [Anderson, 477 U.S. at 251-52](#).

## STATEMENT OF FACTS

Plaintiff Cory Dieteman was a pretrial detainee at the Lancaster County Adult Detention Center ("LADC") in Lincoln, Nebraska beginning March 8, 2011. He was transferred on April 27, 2012 to the Douglas County Correctional Center ("DCCC") in Omaha, Nebraska where he remained until August 27, 2012.

In October of 2011, Defendant Dr. Douglas Morin was hired by Correct Care Solutions ("CCS") to be the medical director at LADC and DCCC. CCS is a medical care company that contracts to provide care to inmates in correctional facilities. Morin's responsibilities included examining patients, performing physical evaluations, evaluating acute care patients and injuries, and organizing appropriate consultations with other physicians. CCS mandated guidelines for completion of Morin's duties.

On January 24, 2012, Dieteman injured his right knee and heard a loud popping noise. Dieteman had previously injured the anterior cruciate ligament ("ACL")[1] in his right knee was concerned he had reinjured it. Three days later, Dieteman had his first appointment with Morin at LADC. Dieteman complained his right knee was unstable. He stated it was numb at the time of the visit, but the knee continually popped out and hurt. Morin noted Dieteman's previous ACL injuries, examined the knee, and watched Dieteman walk. Morin noted the knee moved beyond its ordinary range of motion, but Dieteman's gait was normal. Based on his evaluation, Morin diagnosed Dieteman as having a torn medial collateral ligament ("MCL").

There are multiple methods for treating a torn MCL. The conservative treatment is to try to stabilize the knee, manage pain and inflammation with medication, and caution the patient to avoid further injury. Surgical repair is a definitive and more aggressive treatment for a torn ligament, (Filing No. 97 ¶ 26 at CM/ECF p. 10; Filing No. 90-8 ¶ 7 at CM/ECF pp. 2–3), but it is not the first option used for treating a torn MCL absent evidence of a more serious condition. (Id. at p. 11). MCL injuries are capable of healing on their own. An MRI is necessary to gauge the extent of an MCL or ACL injury. (Filing No. 90 ¶ 27 at CM/ECF p. 8; Filing No. 97 at CM/ECF p. 11).

Morin noted Dieteman could easily injure his knee further. However, based on his examination and medical judgment, Morin concluded conservative treatment was proper: He did not believe surgery was appropriate at that time. (See Filing No. 90-8 at CM/ECF pp. 3, 4, & 9). He prescribed medication for pain and inflammation, provided an ace bandage and neoprene sleeve for stabilization, and instructed Dieteman to take precautions to avoid

---

[1] Dieteman had originally injured his ACL in 2006 and had a right knee reconstruction in 2007. While incarcerated in Minnesota in 2011, he injured the knee again, but was not treated.

further injury.  Morin noted an MRI was needed for further assessment, but surgery would not likely occur due to CCS's policy.

Under CCS's policy, if an inmate had an injury that did not cause significant pain, did not subject them to any meaningful risk of further injury, and did not impair their activities, surgical intervention was not pursued.  A majority of inmates at LADC and DCCC were detained for short periods of time – the average incarceration was less than 25 days at each facility.  CCS believed that in most cases, scheduling a surgical consult was not feasible or in the patient's best interest due to the lack of time for a consult, surgery, and rehabilitation.  For this reason, Morin was required to request approval before referring an inmate to outside medical care.

Morin saw Dieteman at LADC multiple times in the Spring of 2012.  On March 15, 2012, Dieteman complained of pain in his groin and blood in his urine – attributing it to the pain medication.  Dieteman also asked what was going to be done about his knee.  On April 17, 2012,  Dieteman wanted to have his eyes examined.  He again complained of knee instability during the appointment and requested an MRI.  Throughout these appointments, Morin did not change his previous determinations regarding Dieteman's knee and treatment. (See [Filing No. 90-8 at CM/ECF pp. 7–15](#)).

On April 27, 2012, Dieteman was transferred to DCCC.  Dr. Mark Foxall is the Director of Douglas County Department of Corrections ("DCDC").  Foxall is responsible for formulating and enforcing policies and procedures governing DCDC, including those policies facilitating inmate access to medical care.  Captain Mary Earley is supervised by Foxall at the DCDC.  Earley is tasked with monitoring CCS's compliance with its duties. and she reviews inmate request forms ("kites") regarding medical issues.

Inmate grievances, or "kites," which are addressed to the medical department go directly to CCS personnel for review. Earley personally investigates and responds to medical care complaints when directed towards Foxall or herself. ([Filing No. 87 ¶ 11 at CM/ECF p. 7](#)). Earley regularly communicates with Foxall regarding inmate medical issues and grievances. However, the discussions often concern either long-term care or emergency issues. Non-emergent issues receive less attention and are brief conversations "at best, if at all." ([Id. at ¶ 12](#)). Foxall has never received information suggesting that the delegation of medical investigations and responses to Earley has negatively impacted detainee or inmate medical care. ([Id. at ¶ 11](#)).

After Dieteman arrived at DCCC, he submitted numerous kites regarding his knee injury: From May 2, 2012 to June 22, 2012, Dieteman submitted five kites to medical personnel (CCS). In one kite, he stated his right side had become numb but "the rest still hurts on a daily basis." In a kite dated May 17, 2012, sent to the 'medical director' (Morin), he stated the pain had increased and was waking him up at night. On May 21, 2012, Morin saw Dieteman at DCCC. Dieteman informed Morin of the persistent pain and instability in his knee. Morin determined Dieteman had been under his care longer than expected. Morin scheduled an appointment for an off-site orthopedic surgeon consult with the goal of evaluating Dieteman's knee and requesting repair. After scheduling the appointment, Morin sought approval from CCS. Morin provided Dieteman with a new neoprene sleeve and a stabilizing knee brace.

A few days after the May 21st appointment, CCS determined Dieteman should not be referred to an outside specialist; the appointment was cancelled. On June 6, 2012, Dieteman met with Morin to discuss his knee and the knee brace. Morin learned Dieteman's knee brace had been taken from him on June 3, 2012. Morin noted Dieteman wanted the knee brace back, but he did not suggest a change in treatment. ([Filing No. 90-8 at CM/ECF p. 14](#)).

5

Morin and Dieteman met one last time in August of 2012. Morin noted there were no changes in symptoms and new treatment was not planned. (Id. at p. 15).

On June 22, 2012, Dieteman submitted a kite to Foxall. Foxall did not see Dieteman's kite, but believes his assistant sent it to Earley. (Filing No. 87 ¶ 13 at CM/ECF p. 7). Earley reviewed the kite and sent a response to Dieteman on June 27, 2012. In reviewing the kite, Earley examined Dieteman's inmate file and complete medical record, including the previously filed kites. She concluded Dieteman was receiving appropriate medical care and noted he had refused pain medication on multiple occasions.[2] (Filing No. 94 ¶ 14 at CM/ECF p. 3). Neither Earley nor Foxall have medical expertise.

On July 19, 2012, the Office of Public Counsel/Ombudsman's office ("Ombudsman") sent an email to Foxall regarding a complaint from Dieteman. The Ombudsman email stated Plaintiff "is complaining that he is not receiving proper medical attention for a knee injury . . . ." The email also stated that a doctor had told Dieteman he would not receive further treatment for his knee and his brace had been taken away. (See Filing No. 94-5 at CM/ECF pp. 23–28). The Ombudsman requested Dieteman's medical records. Foxall forwarded the email to Earley and requested she "look into it." Earley responded to the Ombudsman stating, "Mr. Dieteman has been seen numerous times by the medical department. He presents an old knee injury from 2010 . . . . The injury is not causing any limitation in his activity." (Id. at p. 26). Earley sent the Ombudsman up-to-date copies of Plaintiff's medical records and inmate file for investigation. Earley copied Foxall on her response back to the Ombudsman.

---

[2] In reviewing Dieteman's file, Earley noticed Dieteman was a porter for the facility. This inmate position is akin to a janitor and is a physically strenuous job. The prison handbook requires an inmate applying for a porter position to have no medical restrictions due to its physical nature. In addition to the medical records viewed, Dieteman's position as a porter influenced Earley's conclusion that Dieteman's knee did not restrict his activities. (See Filing no. 94-5 at CM/ECF pp. 11 & 12).

6

On July 28, 2012, Dieteman submitted another kite directly to Earley. However, Earley was on vacation and did not see the kite. Instead, Captain John M. Hubbard responded on August 3, 2012, stating "[t]he doctor has informed you several times that the knee is not impairing the patient's activities of daily living and was not a progressive condition."

In late August of 2012, Dieteman was discharged from the DCCC. Soon thereafter, Dieteman saw an orthopedic specialist, Dr. Levy. Levy diagnosed Dieteman as having an ACL deficient knee.[3] Dieteman had surgery on February 7, 2013. Dieteman's previous ACL graft was removed and a new ACL was constructed. Levy also removed part of the plaintiff's meniscus. In the opinion of Dr. Wicklund, testifying expert for the plaintiff, the delay in surgery resulted in more of the medial meniscus being removed, increasing the risk of arthritis for the future.

Dieteman filed this lawsuit on March, 14 2014, alleging Defendants were deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's constitutional rights. (See Filing No. 1 at CM/ECF pp. 13–19). Plaintiff named Morin, Lancaster County, Lancaster County Adult Detention Center, Michael Thurber, Douglas County, Douglas County Adult Detention Center, Mark Foxall, and Jane Does and John Does 1-10 as defendants.[4] On October 1, 2015, the County of Lancaster, Nebraska and Thurber (the "Lancaster Defendants"), Foxall, and Morin moved for Summary Judgment. (See Filing No. 83; Filing No. 86; Filing No. 89). On October 20, 2015, Defendant Douglas County moved for Summary Judgment. (See Filing No. 91).

---

[3] Plaintiff's ACL was not torn but had stretched in an "abnormal way" and did not function as it should.

[4] Jane Does and John Does 1-10 have not been identified.

## ANALYSIS

Plaintiff's Complaint alleges Fourteenth and Eighth Amendment claims, based upon inadequate medical care. (See Filing No. 1-1). Plaintiff alleges Morin violated his constitutional rights by providing inadequate care. He further alleges all other defendants are liable because Morin's violation was caused by a CCS policy which was approved and followed by the remaining defendants. Plaintiff argues in his brief that Foxall personally violated Plaintiff's constitutional rights by disregarding his serious medical needs and Douglas County is liable as his employer.

## BURDEN OF PROOF

As a pretrial detainee, Dieteman's claims of inadequate medical care arise under the Due Process Clause of the Fourteenth Amendment and are analyzed under the Eighth Amendment standard. Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). Medical care violates the Eighth Amendment if the acts or omissions are sufficiently harmful to evidence deliberate indifference to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Rellergert by Rellergert v. Cape Girardeau, Mo., 924 F.2d 794, 796 (8th Cir. 1991).

The deliberate indifference standard includes both an objective and subjective component. Letterman v. Does, 789 F.3d 856, 861–62 (8th Cir. 2015). Under the objective component, the plaintiff must demonstrate he suffered a substantial risk of serious harm. Id. To prove the subjective component, the plaintiff must show (1) the defendant knew of the

8

substantial risk of harm and (2) the defendant "knew [his] conduct was inappropriate in light of that risk."[5] Id. at 862.

To prove deliberate indifference, the plaintiff must show more than mere negligence or unreasonable actions in light of the perceived risk. See Krout v. Goemmer, 583 F.3d 557, 568 (8th Cir. 2009). Even a showing of gross negligence is insufficient. Popoalii v. Correctional Medical Servs., 512 F.3d 488, 499 (8th Cir. 2008). Deliberate indifference parallels criminal recklessness. Id. In general, an official manifests deliberate indifference by "intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Krout, 583 F.3d at 567.

### 1. Morin's Alleged Constitutional Violation

The objective component is not at issue: It is undisputed that Dieteman's knee injury posed a risk of harm. But the subjective component is disputed; that is, Morin contends he did not know Dieteman had an ACL injury, but instead believed Dieteman's MCL was injured. Dieteman suggests Morin should be judged by the greater risk of harm, the injury to the ACL which was later diagnosed and treated. To support this contention, Plaintiff asserts Morin knew Dieteman's medical history and should have been more suspicious of an ACL injury. He argues if Dieteman's actual injury was known, Morin would have perceived a higher risk and should have suggested surgery.

Morin diagnosed Dieteman as having a torn MCL after conducting a full examination. Neither testifying expert states Morin's diagnosis was unreasonable, and Plaintiff's expert, Wicklund, testified Dieteman's actual ACL injury was "abnormal." There

---

[5] The court can infer the defendant's knowledge if the risk was obvious. Letterman, 789 F.3d at 862 (citing Farmer v. Brennan, 511 U.S. 825, 842–43(1994)).

is no evidence Morin had actual knowledge of Dieteman's ACL injury nor is there evidence showing the injury was so obvious that Morin's knowledge can be inferred. While Dieteman's actual ACL injury may have subjected him to a more substantial risk of harm, the court "must avoid determining the question 'with hindsight's perfect vision.'" See Letterman, 789 F.3d at 862. (quoting Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998)).

Even if this court were to infer Morin's knowledge of an ACL injury, the Eighth Circuit has previously upheld summary judgment for a defendant in a case where an orthopedic specialist recommended surgery for an inmate's torn ACL and the surgery was not performed. See Blondheim v. County of Olmsted, 47 Fed. Appx. 766 (8th Cir. 2002). In Blondheim, an outside orthopedic surgeon diagnosed an inmate as having a torn ACL and recommended surgery. Id. at 788. Over the plaintiff's four-year incarceration, doctors at the correctional facility knew of the surgeon's recommendation but made no attempt to implement it. Id. Blondheim held that even though they failed to implement the surgical recommendation, Defendants were not deliberately indifferent because they did not ignore the injury. Instead, they treated the inmate's torn ACL conservatively, mainly by providing him Tylenol and ace bandages. Id. at 789; see also Taylor v. Dutton, 85 F.3d 632 (7th Cir. 1996) (defendants who refused to perform a recommended surgery for plaintiff's torn ACL were entitled to summary judgment because there was no evidence they knew of an excessive risk to the inmate's health and failed to act on that knowledge).

The court must look to Morin's actions "in light of the information he possessed at the time, the practical limitation of his position and alternative courses of action that would have been apparent to an official in that position." Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000). Plaintiff must show Morin "deliberately disregarded" Plaintiff's needs. Krout, 583 F.3d at 567. When Morin first met Dieteman, Morin noted Dieteman's symptoms and medical history, examined the knee, watched Dieteman walk, and diagnosed Dieteman as having a torn MCL. Morin understood a torn MCL could heal itself and did not believe

10

surgery was appropriate. (See Filing No. 90-8 at CM/ECF p. 3). Morin acknowledged an MRI was needed to further assess the injury, but did not order one because he did not believe surgery would be pursued. Morin took steps to abate the risk he perceived by prescribing pain medication, providing an ace bandage and neoprene sleeve, and instructing Dieteman to be cautious. Morin saw Dieteman again several times over the following months. Throughout these visits, Morin's notes regarding the knee – or the lack of any such notes – indicate he did not detect worsening or additional injury to the knee. (See Filing No. 90-8 at CM/ECF pp. 7–15).

In late May, Morin ordered a consult with an orthopedic surgeon and provided Dieteman a knee brace. Both of these treatment measures were later negated due to the limitations of Morin's position – the prison took Dieteman's brace and CCS did not approve an outside consult. Regardless, Morin still felt Dieteman's condition was stable and the risk of harm was not excessive; he did not change treatment. (Filing No. 90-8 at CM/ECF p. 14). Morin saw Dieteman two last times in June and August and noted no progression of the injury. (See Filing No. 90-8 at CM/ECF p. 15).

Throughout the time he treated Dieteman, Morin did not deliberately disregard Dieteman's knee injury simply by utilizing a treatment path that may have been unsuccessful. See Estelle, 429 U.S. at 106; Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987). Morin never stopped treating Dieteman or attempting to provide Dieteman medical care. Morin was not deliberately indifferent to Dieteman's risk of harm. For these reasons, Dieteman cannot show Morin intentionally denied or delayed medical care.

Dieteman argues Morin was deliberately indifferent in that (1) Morin did not investigate Dieteman's condition using an MRI or outside consult;[6] (2) the treatment provided was improper for even a torn MCL; (3) Morin could have done more to treat the plaintiff after the brace was taken away and the consult request was denied; and (4) Morin never asked Dieteman how long he was going to be incarcerated. Each argument does little more than question Morin's medical judgment and is unavailing. See Noll, 828 F.2d at 462 (affirming summary judgment in favor of prison physician when inmate only raised questions of medical judgment); see also Estelle, 429 U.S. at 106 (holding a doctor's choice to use an "X-ray or [other] diagnostic techniques" is "a classic example of a matter for medical judgment."); Jenkins, 557 F.3d at 632 (upholding summary judgment in favor of a physician who decided to postpone X-ray). Dieteman has failed to show Morin's alleged inadequate treatment supports anything more than a medical malpractice or negligence claim.

Based on the undisputed evidence of record, the court finds Plaintiff has failed to show Morin was deliberately indifferent to Dieteman's knee injury. Rather, Morin used his medical judgment to provide Dieteman with care commensurate with the perceived risk.

### 2. Foxall's alleged Constitutional Violation

Foxall disputes Dieteman had a serious medical need sufficient to meet the objective component. "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011). Morin determined Dieteman had a torn MCL and prescribed conservative treatment. Dieteman meets his burden on the objective component.

---

[6] Although Plaintiff makes this argument, he concedes in his brief in opposition that ordering both an outside consult and an MRI would require Morin to request permission from CCS. This is limitation on Morin's position and the treatment he was able to provide that the court must consider.

Foxall asserts he did not know Dieteman was subject to an excessive risk of harm. He states his only awareness of Dieteman's injury came from the Ombudsman email. He further contends the information provided in the email was not enough to raise a belief that Plaintiff's knee created a substantial risk of harm.

Dieteman argues Foxall had knowledge of the condition because (1) a kite was directly submitted to Foxall on July 22, 2012; (2) Foxall received the Ombudsman email on July 19, 2012; and (3) Foxall was "exposed to the information and thus should have known about [Dieteman's risk of harm]".

The July 22, 2012 kite was sent to Foxall. However, Foxall testified he did not recall seeing the kite. ([Filing No. 88-6 at CM/ECF p. 27](#)). Foxall's assistant sent the kite to Earley for response according to routine. Earley investigated the complaint and responded. There is no evidence that Earley and Foxall discussed Dieteman's condition or complaints.

Foxall received the Ombudsman email on July 19, 2012. The email outlined Dieteman's medical care complaints. Specifically, Dieteman claimed he was being denied x-rays, MRIs, and pain medication; his knee brace was taken away; and he was no longer receiving medical attention. The email did not specify Dieteman's injury but was simply stated it was a "knee injury." Foxall forwarded the email to Earley to handle. Earley copied Foxall on the response and stated, "Mr. Dieteman has been seen numerous times by the medical department. He presents an old knee injury from 2010 . . . . The injury is not causing any limitation in his activity." Earley attached Dieteman's inmate file and medical records, however there is no evidence suggesting Foxall examined the attachments.[7]

---

[7] Plaintiff argues giving merit to Foxall's defense that he forwarded Dieteman's complaints to Earley would reward him for 'putting his head in the sand.' The circumstances of the case which Plaintiff cites are clearly distinguishable. See [Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005)](#).

From reading these emails, Foxall could have learned Dieteman had complaints about a knee injury, he had been receiving medical attention, and the injury did not impair his activities.

Dieteman argues because Foxall was exposed to Dieteman's 'well-documented' case, Foxall should be considered to have actual knowledge of Dieteman's injury. Exposure does not equal knowledge. Plaintiff fails to provide evidence showing that Foxall either investigated Dieteman's grievances himself, read through Dieteman's records, or even spoke with Earley concerning Dieteman.

Even if Foxall had knowledge of Dieteman's risk of harm, Dieteman must show Foxall knew his actions were inappropriate in light of the risk. After receiving the Ombudsman email, Foxall forwarded it to Earley to handle. He did not ignore the email, but sent it to the employee that investigated medical complaints. In her response, Earley indicated she had looked into the matter, Dieteman was receiving medical attention, and his activities were not impaired. Plaintiff does not show Foxall's reliance on Earley was unreasonable. Foxall has never received information suggesting his delegation to Earley negatively affects inmate medical care. Plaintiff has failed to show Foxall's actions were inappropriate, much less that he acted with knowledge that his actions were inappropriate.

Finally, even assuming Foxall had examined Dieteman's inmate file and medical record, there is no evidence suggesting he would have concluded differently than Earley, his employee who handled medical complaints, and Morin, Dieteman's treating physician.

Based on the undisputed evidence of record, the court finds Plaintiff has failed to show Foxall was deliberately indifferent to Dieteman's knee injury.

In the Eighth Circuit, in order for municipal liability to attach, individual liability must be found on an underlying substantive claim. See [McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005)](); [Turpin v. County of Rock, 262 F.3d 779, 784 (8th Cir. 2001)]() (concluding because summary judgment was granted in favor of officers, the county likewise

14

was entitled to summary judgment); Abbott v. City of Crocker, 30 F.3d 994, 998 (8th Cir. 1994) (holding a city cannot be liable on a municipal custom or policy theory unless a defendant officer is found liable on an underlying substantive claim).

Dieteman's policy/custom claims against Lancaster County, LADC, Thurber, Douglas County, DCCC, and Foxall are based solely on Morin's alleged violation of Plaintiff's constitutional right to adequate medical care. Since the plaintiff has failed to present a potential claim of individual liability against Morin, the custom/policy claims against the remaining defendants similarly fail.

Similarly, because Plaintiff fails to present a genuine issue of fact on his substantive claim against Foxall, his derivative claim against Douglas County fails.

Dieteman has failed to present evidence sufficient to raise a genuine issue of fact supporting his claim that his constitutional rights were violated. Absent deliberate indifference by the treating official or evidence of a constitutional violation, summary judgment must be granted. See Long v. Nix, 86 F.3d 761 (8th Cir. 1996).

THE COURT HEREBY ORDERS:

1) As to all claims alleged in the plaintiff's complaint, the defendants' motions for summary judgment, (Filing No. 83; Filing No. 86; Filing No. 89, and Filing No. 91), are granted.

2) All claims are dismissed against all Defendants.

3) A separate judgment will be entered in accordance with this memorandum and order.

Dated this 8th day of December, 2015

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge